NOT FOR PUBLICATION

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CHRISTOPHER PATTERSON,** *Plaintiffs*, v. **AETNA LIFE INSURANCE COMPANY,** *Defendant.* | **Civil Action No. 15-8156** **OPINION** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Plaintiff Christopher Patterson's ("Plaintiff") motion for summary judgment and Defendant Aetna Life Insurance's ("Defendant" or "Aetna") motion for summary judgment. ECF No. 24, 25. Following spine surgery, which rendered Plaintiff disabled in 2007, Aetna paid and continued benefits for seven years. Despite a finding in 2009, based on an independent medical examination, that Plaintiff continued to be disabled, Aetna had an inexplicable change of heart five years later. Utilizing the wrong standard, ignoring the very evidence it relied upon earlier, discounting Plaintiff's subjective complaints and his doctor, and relying on a "record review" and some limited equivocal surveillance reports, Aetna determined that Mr. Patterson was no longer disabled. Under the circumstances, that decision was arbitrary and capricious. For the reasons set forth herein, Plaintiff's motion is **GRANTED** and Defendant's motion is **DENIED**.

## I.    BACKGROUND

This ERISA matter arises from Defendant Aetna's termination of Plaintiff Patterson's long-term disability benefits allegedly in violation of the terms of his disability plan.

1

Patterson is a forty-six-year-old individual residing in Cibolo, Texas. Compl. ¶ 17. Plaintiff was last employed by First Consulting Group, Inc. ("FCG"), a firm that provides information technology and other consulting services to healthcare organizations. Defendant's R. 56 Statement ("Def.'s R.56 Stmt.") ¶ 2, ECF No. 24-1. Defendant is an insurance company, headquartered in Hartford, Connecticut and operating in New Jersey. Id. at ¶ 3; Compl. ¶ 20. Aetna provides group life and long-term disability ("LTD") insurance to employers to support benefits plans for employees. Def.'s R.56 Stmt. ¶ 3.

**A. The Plan**

FCG provides long-term disability benefits coverage to its employees under the terms of its long-term disability group policy (the "Policy"), policy number GP-723852. Def.'s R.56 Stmt. ¶ 4-5; Administrative Record ("AR") 00007. The Policy gives Aetna "discretionary authority" to determine "whether and to what extent employees and beneficiaries are entitled to benefits" and to "construe any disputed or doubtful terms." Def.'s R.56 Stmt., ¶ 6; AR 00136. The details of the LTD benefits for Plaintiff were contained in a "Booklet-Certificate." Def.'s R.56 Stmt., ¶ 8; AR 00102, 00117, 00001-36.

The Booklet-Certificate for the FCG LTD policy defined "disability" as follows:

You will be deemed to be disabled on any day if:

- you are not able to perform the material duties of **your own occupation** solely because of: disease or injury; and
- your work earnings are 80% or less of your adjusted predisability earnings.

If your own occupation requires a professional or occupation license or certification of any kind, you will not be deemed to be disabled solely because of the loss of that license or certification.

AR 00018 (emphasis added).

Under the FCG policy, LTD benefits end on the date the participant is "not totally disabled" or "fail[s] to give proof that you [the participant] are still totally disabled."  AR 00019.

**B.  Plaintiff's Own Occupation**

From 2005-2006, Patterson was employed by FCG in the position of System Development Technical Director.  Def's. R. 56 Stmt. ¶ 12-13.  By e-mail dated September 26, 2007, Aimee Besagar, the Benefits Administrator at FCG provided Aetna with a "general position description" for Patterson, as listed in FCG's career development documents.  AR 00289-90.  The general description stated as follows:

> Systems Development positions apply to several business groups across the Firm. Associates in Systems Development positions possess experience in analysis, design, development, implementation, and maintenance of information systems and web-based applications. Knowledge of Object Oriented Design (OOD), distributed systems, client/server or n-tiered systems, web-deployed transactional systems, custom software solutions, and/or document management systems is required.

> System Development associates are expected to accomplish annual goals, achieve solid to excellent ratings on Annual Evaluations, and be fully billable to our clients by meeting or exceeding utilization targets. **Extensive to full-time travel may be required.**

Id. (emphasis added).  Ms. Besagar also provided the following chart regarding the Technical Director position:

| Position | Educational Requirements | Min Yrs Exp | Developmental Focus for Progression to Next Level | Key Accountabilities | UTIL % | TAL |
|---|---|---|---|---|---|---|
| Technical Director - Systems Development | BA/BS Degree; advanced degree and/or relevant certifications beneficial | 10 | Level 4/Level 5 Foundation skills; retain expert functional area knowledge ; advanced IT, Healthcare, Health Plan, Pharmaceutical and/or Life Sciences knowledge, level 2 business development/sales support and leadership skills; level 3 decision making skills | Serves as specialty or technical leader in Practice Unil/BU; successfully markets and uses skills; accountable for project economics , quality results and client satisfaction; Identifies sdd- on work; demonstrates excellent leadership ability; makes good decisions on behalf of the Firm;  develops senior technical/specialty associates;  completes reviews within 30 days  of due date | Sat by BU | 13 |

Id.

Patterson provided additional descriptions of his work duties. Id. at 00804, 00841, 00849-50. In a "Claimant Supplemental Statement" from 2008, Patterson wrote "my work involved 100% travel." Id. at 804. Subsequently, in his appeal letter from 2014, Patterson reasserted that "[m]y job requires 100% travel to client locations," explaining "FCG . . . would fly me from my airport to the client on Sun/Mon and fly back Thur/Fri." Id. at 00849. While at client locations, Patterson's job allegedly required "meetings with executives" and "standing giving presentations." Id. Patterson's appeal letter also alleges he did not have an office location as a result of this travel requirement. Id.

### C. Plaintiff's Claim for LTD Benefits

In 2001, Patterson underwent a surgical procedure as a result of degenerative joint disease of the lumbar spine. AR 00819. Patterson continued to work full time without restrictions after the surgery until mid-2006. Id. at 00329. Patterson's last work date was August 11, 2006, at which time he applied for and was granted short-term disability benefits for a six-month period in anticipation of another planned surgery scheduled for late 2006 or January 2007. Id. at 01087; 00331. Patterson underwent a lumbar spine reconstruction surgery on January 26, 2007, performed by Dr. Stephen E. Earle, M.D., who is Board certified in orthopedic and spinal surgery. Id. at 00347-51; 00819. After the surgery, Patterson was unable to work and began a program of physical therapy and pain medication. Id. at 00336; 00337. In accordance with the terms of the Policy, Aetna approved Patterson for LTD benefits, beginning February 14, 2007, to be paid until August 31, 2037, assuming his medical condition remained unchanged. Id. at 01053-55.

### D. Plaintiff's Social Security Benefits

By letter dated August 8, 2007, Aetna requested Patterson apply for Social Security Disability Benefits, as required by the terms of the Plan. Id. at 01073. The Social Security Administration notified Patterson that his application had been approved and that he would receive monthly disability benefits payments effective February 2007. Id. at 01160-65.

### E.  Continuation of Plaintiff's LTD Benefits Claim

### 1.  Plaintiff's Proof of Ongoing Disability from 2007 to 2014

Aetna requires persons who are receiving LTD benefits to provide proof of ongoing disability and proof that they remain under the care of a physician. Def.'s R.56 Stmt. at ¶ 32. Consequently, Aetna asks such persons to have their physicians complete "attending physician statements" ("APSs") and "Capabilities and Limitations Worksheets" ("CLWs") on a periodic basis. AR 01134-35, 01167.

During the period from 2009 to 2014, Dr. Dennis E. Karasek, a pain management physician in San Antonio, Texas, submitted APSs and CLWs on Patterson's behalf. Def.'s. R. 56 Stmt. at ¶ 32-33. Dr. Karasek consistently opined that Patterson was permanently disabled and could not work. Id. at 00079-82, 00088-91, 00094-95, 00901-03, 00905-06. The CLWs stated Patterson could not lift any weight, drive a motor vehicle, or engage in a variety of physical activities, including kneeling, bending, and twisting. Id. Dr. Karasek also submitted progress notes throughout this period, identifying the medications he prescribed for Patterson. AR 00919-926, 00929-931, 01254-5, 01256-7.

On May 7, 2014, Patterson visited Dr. Karasek, complaining of muscle spasms in the lumbar area after Patterson lifted an object and twisted. Id. at 00937-38. On November 21, 2014, visit notes from Dr. Karasek's office indicate that Patterson was looking into a spinal cord stimulator trial. Id. at 01286. Patterson claimed his "medications only reduce[] pain to 8/10" but

"allow him some time . . . to play with his children." Id. The notes also indicate that "if the stimulator does not reduce[] pain he will consider surgical options." Id.

### 2. Defendant's Surveillance and Ongoing Review of Patterson's File

From 2007 to 2014, Aetna repeatedly checked Patterson's claim to ensure ongoing disability. In March 2008, Defendant engaged Bauer Investigations to surveil Patterson. AR at 01106-09. On Tuesday, March 18, 2008, surveillance was conducted but the investigator did not observe any activity. Id. The next day, the investigator observed Patterson for a total of thirty-seconds, in which he walked to the curb and disposed of a small amount of garbage. Id. Finally, on Thursday, March 20, 2008, the investigator observed no activity. Id.

In January 2009, Defendant again engaged Bauer Investigation to follow Patterson and take video surveillance footage. Plaintiff's Rule 56 Statement (Pl.'s R.56 Stmt.) ¶ 17, ECF No. 25-2. Plaintiff was observed walking outside his residence, gathering mail, bending at the waist, putting fluids into his truck, kneeling to check something in his vehicle, driving away and thereafter returning, and twirling his cane as he walked. Def's. R.56 Stmt. ¶ 24; AR 00480. The following day, Plaintiff was observed walking outdoors and carrying his child without using a cane. AR at 00481. Similar activities, including driving a truck and walking at a brisk pace, were observed on subsequent days. Id. at 00481-82. Additional surveillance was conducted in April 2009, which showed Patterson driving at a high rate of speed. Id. 00469.

Subsequently, in April 2009, Aetna required Plaintiff to appear for an independent medical examination ("IME") and obtained an IME report dated April 9, 2009 from Dr. Salvador Baylen, M.D. Pl's. R.56 Stmt. ¶ 23; AR 00819-25. Dr. Baylen reviewed Patterson's medical history and current medications, and viewed the video surveillance taken by Bauer Investigation. AR 00819-25. Dr. Baylen also conduct a physical examination of Patterson. Id. Dr. Baylen diagnosed

Plaintiff as suffering from "failed back syndrome."  Id.  Dr. Baylen found the following restrictions:

> Based on the evaluation today, in my opinion, the patient is going to be restricted with heavy lifting, prolonged bending, prolonged stooping, and prolonged sitting.
>
> He is, in my opinion, able to perform **sedentary work** for 40 hours per week. After some degree of conditioning or work hardening, I believe the patient is able to perform light duty physical work for 40 hours per week.

AR 00823 (emphasis added).

On June 8, 2009, over a month after the IME, Aetna determined that Patterson "has no ability to work," found that he remains totally disabled, and granted "continued approval" of his claim.  AR 00180.

Later, on August 5, 2009, Aetna requested a Labor Market Survey report to determine the existence of employment opportunities that would enable Mr. Patterson to earn eighty percent or more of his pre-disability income.  Id. at 01147-53.[1]  Aetna identified and contacted eight employers within the occupations of Director, Management Information Systems, Systems Analyst, as well as related titles.  Id.  None of the employers satisfied the criteria of existing within a fifty mile radius of Patterson's home, within the sedentary work level, and meeting or exceeding the target wage of $71.76 per hour.[2]  Id.  Subsequent analyses of the job market through the period from 2007 to 2014 reached the same conclusion.  Id. at 00616, 650, 653, 665.

### 3. Defendant's Continuing Certification of Plaintiff's LTD Benefits from 2007-2014

---

[1] It is unclear why Aetna conducted a Labor Market Survey.  Aetna claims it arose out of a misinterpretation out of the test for disability in the Policy.  See Defendant's Reply Memorandum at 2.

[2] $71.76 is 80% of Patterson's pre-disability income.  AR 01147-53.  However, Aetna later lowered this number to $58.19 per hour, without explanation or justification.  AR 00650.

On June 22, 2010, Aetna's records indicated Patterson's LTD claim "remains active." Id. at 00180. As of September 24, 2012, Aetna's records indicated that Patterson "cannot work" and that the "med. [i]nfo. continues to support [Patterson's] disability." Id. at 00171. Additionally, on September 24, 2012, Aetna "recertified" Patterson's long term disability claim, and designated his claim for recertification "in 1 year." Id. As of November 22, 2013, Aetna's records indicated that Patterson "remains with no ability to work" and determined the "med. info. continues" to support Patterson's disability. Id. at 00168.

### F. Defendant's Termination of Plaintiff's LTD Benefits in 2014

### 1. Defendant's 2013 Surveillance

At the end of November 2013, Aetna engaged ICS Merrill Investigative Services to surveil Patterson and prepare a report on his activities. AR 00037-49. The report stated that Patterson had been observed driving his children to school on December 2 and 3, 2013. Id. at 00045. A second report, dated December 23, 2013, stated Patterson had been observed driving away from his residence. Id. at 00050-54.

Subsequently, Patterson was surveilled by Claims Bureau USA, Inc. Id. at 00055-65. Claims Bureau USA submitted a third investigate report, dating January 31, 2014, which reported that Patterson was observed driving his car, parking, walking and otherwise moving about with no visible signs of discomfort. AR 00055; 00060-61. The report also included a summary of Plaintiff's wife's Facebook profile, as follows:

> She posted on 6/29/11 saying, "At the airport heading to Europe." This trip is believed to have lasted until 8/13/11 when she posted, "At Toulouse airport…going back to the real world." She posted on 7/8/11 saying "Just landed in Vegas…" She posted on 3/26/11 saying, "Christopher and I were wrestling today." She posted on 8/13/10 saying, "Chris's 40th birthday in France." She posted an album titled DisneyWorld" on 6/9/10. She posted on 6/2/10 saying, "Going to Rome/Paris in 2 months." She posted an album titled, "Christmas at South Lake Tahoe" on 1/6/10. She posted multiple photos from several trips since 2006. It cannot be determined

if the claimant went on all of these trips; however, there are photos of him in France, Disney, and Tahoe.

AR at 00058-59.

## 2. Defendant's September 2014 Medical Review

On July 24, 2014, Aetna's clinical reviewer—Judy Tierney, R.N.—and the disability benefit manager then assigned to Patterson's case—Judith Robbins—ordered a full review of Patterson's case based on several alleged inconsistencies between the video surveillance and the medical evidence in Patterson's file. Id. at 00629. An outside medical peer reviewer was engaged to review the file and provide an opinion as to any restrictions on Patterson's activity. Id. at 00636-37. At Aetna's request, Dr. Lucia McPhee generated a report dated September 7, 2014, which provided her findings. Id. at 00868-73. Dr. McPhee based her findings on a review of the medical records and the surveillance videos, but she did not personally examine Patterson. Dr. McPhee concluded as follows:

> Based on the above evaluation, the claimant is status post multilevel low back fusion with instrumentation with ongoing complaints of chronic pain and intermittent spasm, such as with his exacerbation for which he presented to Dr. Karasek on 5/7/14 after twisting/lifting. Despite his ongoing chronic pain issues though, he should still has a certain amount of residual functional capacity, such that he is able to go about his day to day activities and drive about the community. The records currently available for review should not preclude a sedentary physical demand level as of 1/1/14 continuously through 12/31/14. When he presented on 5/7/14 with exacerbation of back symptoms though, such that he reportedly had spasms and received trigger point injections, then temporarily, possibly for a few days but less than a week, less than a full time sedentary physical demand level would be temporarily reasonable. The file does not support continuous limitations though from a sedentary physical demand level. Thus, as of 1/1/14, the claimant should be able to perform sitting on a frequent basis with an ergonomic set up and if necessary, sit stand workstations, such that he could alternate position as need be throughout the work day. [S]tanding may be limited to an occasional basis and walking may be limited to an occasional basis. Due to chronic low back complaints with history of fusion he should have the flexibility to briefly change positions, such as with a sit stand workstation. Sitting may be for no more than six hours total per eight hour work day. Bending/stooping should be limited to no more than an occasional basis. Crouching may be on an occasional basis. Lifting/carrying may

be limited to ten pounds, which is likely much less than what he was performing at home, especially if he has young children at home. There are no findings on which to base functional limitations for the use of the hand or upper extremities.

Id. at 00872.

Aetna sent Dr. Karasek a copy of the report, asking him to check a box indicating whether he agreed with Dr. McPhee. Id. at 00654. Dr. Karasek checked the box marked "yes" and initialed next to it, after having first marked the space for "no" then crossing it out. Id. at 00862.

### 3. Defendant's November 2014 Vocational Review

Aetna performed a vocational analysis review on November 11, 2014. Id. at 00671. Aetna used the Dictionary of Occupation Titles ("DOT") code no. 169.167-030 (Computer and Information Systems Managers) and (O*Net Code 11-3021.00) to determine whether Patterson could perform his own occupation as understood in the national economy. Id. at 00664-65, 00606-69. Aetna compared the generic description of the position with the description provided by Patterson's employer and concluded as follows:

> It appears that **travel may be a requirement of the [claimant's] job**. However, the occupation as it exists in the national economy is sedentary and does not necessarily deem the occupation to be light in the event a particular employer requires travel as essential to the job tasks. For this reason [generic] occupation is lighter than the [claimant's] job.

Id. at 00669 (emphasis added). In other words, the vocational review found that FCG may require Patterson to travel, but that the generic position in the national economy does not require travel and is lighter than Patterson's particular job.

The vocational analyst determined it is routine in the national economy for employers to provide reasonable accommodations for sedentary occupations, such as mobility aides and "ergo sit/stand work stations, specialized ergo stools and chairs," and to provide "assistance from co-workers to minimize walking to or from work space." Id. at 00666-71. With the aid of these

accommodations, the vocational reviewer concluded the "current limitations and restrictions . . .
are within the scope of [claimant's] occupation . . . in the [national] economy." Id.

### 4. Notification of Termination and Plaintiff's Appeal

On November 20, 2014, Aetna notified Plaintiff that his LTD benefits were being
terminated. Id. at 01295. Patterson handwrote and faxed a letter to Aetna on February 18, 2015,
appealing the decision to terminate his benefits. Id. at 00841. Included with the letter was a note
referring to an earlier communication from Dr. Karasek. Id. at 00840-41, 00849-50. In that
communication, Dr. Karasek stated Patterson was being maintained on "very high doses of
narcotic and pain medication" that resulted in "cognitive changes," but can nevertheless drive and
take "the occasional vacation." Id. at 00841. Karasek further wrote "Patterson should be
considered completely and permanently disabled" and cannot remain at an employment site for
six to eight hours a day, even if he could change position frequently. Id. Patterson's own letter
stated he cannot stand for more than four to five minutes, cannot bathe on a regular basis because
of difficulties standing, and cannot travel as required by his job. Id. at 00841.

After receiving the appeal, Aetna requested a second independent medical peer review,
which was performed by William Andrews, who is Board Certified in orthopedic surgery. Id. at
00275-78. Dr. Andrew's report, dated May 11, 2015, concluded Patterson had the functional
ability to sit without limitation, and walk for forty-five minutes at a time, but that he should avoid
bending, twisting, or crawling. Id. at 00276. Dr. Andrews based his report on Patterson's medical
records, the surveillance video, and Patterson's reported trip to Europe, but he did not personally
examine Patterson. Id. at 00275. Aetna denied Patterson's appeal and upheld the decision
terminating Patterson's LTD benefits by letter dated May 19, 2015. Id. at 01271-73. The letter,
relying in part on Dr. Andrews' report, concluded Patterson could perform the material duties of

his own occupation as defined in the national economy, thus rendering him no longer disabled under the terms of the Policy. Id. at 00282.

### G.  The Instant Action

Patterson filed this ERISA suit against Aetna on November 19, 2015, alleging improper denial of disability benefits. ECF No. 1. Plaintiff seeks review of Defendant's denial of long term disability benefits, reinstatement of disability benefits, life insurance coverage, and interest, court costs, and attorney's fees. Compl. ¶ 13. Plaintiff's and Defendant's cross-motions for summary judgment are now before the Court. ECF No. 24, 25.

## II.    DISCUSSION

The dispositive issue here is whether Defendant's termination of Plaintiff's LTD benefits was arbitrary and capricious. Because Defendant failed to properly address whether Plaintiff could perform the material duties of his own occupation, and because its findings as to disability were not supported by the evidence, the Court finds Defendant's termination was arbitrary and capricious. This determination resolves both motions for summary judgment.

### A.  Motion for Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court should grant summary judgment when "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the Court views all evidence in the light most favorable to the party opposing summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587. The party opposing summary judgment must make a showing sufficient to establish the essential elements of its claim. Celotex, 477 U.S. at 322–34. On cross motions for summary

judgment, the same standards and burdens remain applicable.  See <u>Appelmans v. City of Phila.</u>, 826 F.2d 214, 216 (3d Cir. 1987).

## B.  Standard of Review of Administrator's Determination Under ERISA

A decision to deny benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  When the plan "grants the administrator discretionary authority to determine eligibility for benefits," the "arbitrary and capricious standard" applies.  <u>Miller v. Am. Airlines, Inc.</u>, 632 F.3d 837, 844 (3d Cir. 2011).  An administrator's decision is arbitrary and capricious "if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  <u>Abnathya v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993) (citations omitted).  Here, the parties do not dispute Aetna's ability to determine eligibility for benefits, so the arbitrary and capricious standard applies.  Plaintiff's Summary Judgment Memorandum ("Pl.'s Summ. J. Mem.") at 17; Defendant's Summary Judgment Memorandum ("Def.'s Summ. J. Mem.") at 18.[3]

## C.  Plaintiff's Entitlement to Benefits

The primary issue before the Court is whether Aetna acted arbitrarily and capriciously in determining Plaintiff was not totally disabled within the meaning of the Policy.  Under the explicit terms of Patterson's policy, he is disabled if he is unable to "perform the material duties of [his] own occupation" because of "disease or injury," and if his work earnings are "80% or less of [his] adjusted predisability earnings."  AR 00018.  The Policy leaves the term "own occupation"

---

[3] Plaintiff argues for a heightened form of arbitrary and capricious review based on an alleged structural conflict of interest.  Because the Court finds Defendant's denial and termination would not satisfy any form of arbitrary and capricious review, it need not consider Plaintiff's argument on this point.

undefined, but Aetna's initial termination and subsequent denial letter both define "own occupation" with reference to Patterson's position as performed in the national economy. AR 00282, 01296. The Court finds Aetna's definition contrary to the Policy's plain language. In defining "own occupation," Aetna should have considered the actual duties performed by Patterson before he became disabled. Aetna's failure to do so, and its accompanying failure to adequately consider whether Patterson could perform those duties, renders Aetna's termination arbitrary and capricious.

### 1. Meaning of "Own Occupation"

Aetna argues that "own occupation" is defined based on a national standard, without reference to an employee's specific job requirements. Plaintiff argues Aetna failed to consider Plaintiff's ability to perform his actual job requirements. The Court agrees with Plaintiff's conclusion.

When a plan's language is ambiguous, courts "must defer to [the administrator's] interpretation unless it is arbitrary and capricious." Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012) (quoting McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan, 340 F 3.3d 139, 143 (3d Cir. 2003)). However, no deference is given if the interpretation is "contrary to the plain language of the plan." Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 177 (3d Cir. 2001).

The Third Circuit held that assessment of a claimant's ability to perform the "material duties of his/her regular occupation" requires consideration of the "usual work that the insured is actually performing immediately before the onset of disability." Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 386 (3d Cir. 2003). The Third Circuit based this determination on both "the purpose of disability insurance and the modifier 'his/her' before 'regular occupation'" in the

plan at issue in that case  Id.  The slight difference in wording between the Policy at issue here—

"your own occupation"—and the plan in Lasser—"his/her regular occupation"—does not

command a different result.  See, e.g., Osborne v. Hartford Life & Acc. Ins. Co., 465 F.3d 296,

300 (6th Cir. 2006) (finding the "relatively minor difference in language" between "regular

occupation" and "own occupation" was not the critical issue in deciding whether a plan

administrator properly relied on the Dictionary of Occupational Titles in determining plaintiff's

occupation); see also Peck v. Aetna Life Ins. Co., 495 F. Supp. 2d 271, 277 (D. Conn. 2007)

(finding the policy terms "regular" and "own" interchangeable).

 If a policy explicitly defines "own occupation" with reference to the national economy,

then a broad, generic definition applies.  See, e.g., Nyman v. Liberty Mut. Assur. Co. of Boston,

2005 WL 2175706, at *12 (M.D. Pa. Sept. 7, 2005) (distinguishing Lasser because the plan at issue

"explicitly defined 'own occupation' by referring to how the occupation is performed in the

national economy").  However, in the absence of such a definition, Lasser indicates that defining

"own occupation" nationally is contrary to the Policy's plain meaning.  See Witte v. Connecticut

Gen. Life Ins. Co., 2007 WL 4300224, at 5 (D.N.J. Dec. 6, 2007) (analyzing a plan that defined

disability as being unable to perform "any and all duties of your job" and finding, in accordance

with Lasser, that "[defendant's] reliance on the DOT and O*Net descriptions of the sedentary

nature of similarly tasked jobs, without some consideration regarding the actual functional and

physical requirements of Plaintiff's specific position at [his employer], clearly contravenes the

plain language of the [p]lan").

Aetna argues that the term "own occupation" should be defined generically.  Although

"own occupation" is undefined in the Policy itself, both Aetna's initial termination of Patterson's

LTD benefits and its denial of Patterson's appeal defined "own occupation" as it is performed in

the "national economy" instead of "as performed for [Patterson's] specific [e]mployer."  AR at

00283; 01296.  Given the decision in Lasser, Aetna's interpretation is contrary to the Policy's plain

language and is not entitled to deference.  The cases cited by Aetna in support of its position are

all from courts outside the Third Circuit and are neither binding nor persuasive given the law in

this jurisdiction.  The Court finds that defining "own occupation" must involve consideration of

Patterson's actual duties as performed before the onset of disability. See, e.g., Creasy v. Reliance

Standard Ins. Co., 2008 WL 834380, at *3 (E.D. Pa. Mar. 26, 2008) (finding that the defendant-

insurance company improperly determined Plaintiff's "regular occupation" by applying the DOT

definition and failing to consider the employee's usual work before the onset of disability).

### 2.    Material Duties of Patterson's Own Occupation

The Court next considers whether Aetna correctly determined Patterson's "material

duties."  The Court finds Aetna incorrectly determined that the DOT and O*Net listings contained

an exhaustive list of Patterson's material duties and failed to include his actual duties at FCG.  The

record contains evidence that Patterson's occupation required both extensive travel and standing

to give presentations, facts which Aetna summarily dismissed.

The Policy defines "material duties" as follows:

These are duties that:

- are normally required for the performance of your **own occupation**; and
- cannot be reasonably: omitted or modified.

AR at 00031.

The record contains evidence that Patterson's own occupation normally required extensive

to full-time travel.  In a "Claimant Supplemental Statement" from 2008, Patterson wrote "my work

involved 100% travel."  Id. at 00804.  Subsequently, in his appeal letter from 2014, Patterson

reasserted that "[m]y job requires 100% travel to client locations," explaining "FCG . . . would fly

me from my airport to the client on Sun/Mon and fly back Thur/Fri." Id. at 00849. While at client locations, Patterson's job required "meetings with executives" and "standing giving presentation." Id. at 00804, 00289-90. Additionally, FCG's general job description, which was provided to Aetna, noted that "[e]xtensive to full time travel may be required." AR. 002890. Consequently, the Court finds that Patterson's job regularly required him to travel and stand to give presentations.

This conclusion is supported by Aetna's own vocational review. In determining the material duties of Patterson's occupation, Aetna's analyst distinguished Patterson's occupation, as defined by the government's DOT, from his job at FCG. AR at 00666-69. The analyst acknowledged that "travel may be a requirement of [Patterson's] job [at FCG]" but determined "the occupation as it exists in the [national] economy is sedentary." Id. at 00669. Without any other discussion, the analyst found the occupation was not "necessarily light in the event a particular employer requires travel as essential to the job tasks." Id. The review concluded "[Patterson's] occupation is lighter than the job." Id. Rather than contradicting Patterson's claim that his job requires additional duties beyond those listed in the generic occupation descriptions, Aetna's vocational review acknowledges that FCG required travel. Thus, Aetna's own analyst supports this Court's finding that travel was a material duty of his occupation.

Defendant summarily dismisses Patterson's claims regarding travel: "Patterson never provided any description of what he did other than fly around the country supposedly 100% of the time." Def's. Mem. in Supp. at 25. The Court disagrees. Dating from 2008, Patterson had described his job as requiring travel, and his description is consistent with the general information provided by FCG. If Aetna desired a more concrete description, it could have requested one instead of dismissing the statements in his letter out of hand. See, e.g., Weiss v. Prudential Ins. Co. of America, 497 F. Supp. 2d 606, 614 (D.N.J. 2007) (finding plaintiff's "very detailed two

page synopsis" of his duties sufficient, despite defendant's allegation that it was "self-serving," and determining it was "unreasonable" for defendant to object to the synopsis because "there is nothing in the record to indicate that [defendant] requested anything more authentic or less 'self-serving'"); Witte, 2007 WL 4300224, at *5 ("[Defendant] erred in discrediting Plaintiff's affidavit regarding his work without any contrary evidence"). While Plaintiff's letter here is hardly detailed, it is sufficient to demonstrate that his occupation required extensive travel and frequent standing, neither of which are consistent with a sedentary job. See, e.g., Peck, 495 F. Supp. 2d at 278 (crediting Plaintiff's description of her job duties, which included standing for long periods of time in an operating room, and determining "[w]hatever one might consider to be the general nature of [Plaintiff's] prior job at [her employer], it was not sedentary").

The Court recognizes the "deference given to an administrator's denial of benefits under arbitrary and capricious review favors affirmation of the decision if there is evidence supporting both the claimant and the administrator, and the administrator's decision is reasonable." Witte, 2007 WL 4300224, at 5. However, here, the "exertional and functional requirements listed in the DOT/O*NET are merely relevant to jobs that are similar in tasks to Plaintiff's job." Id. There is nothing "linking these two descriptions to an accurate description of Plaintiff's job" at FCG. Id. This missing like would be provided if an "[FCG] employee with knowledge regarding the requirements of Plaintiff's job had attested to the accurateness of the DOT/O*Net description." Id. As it stands, there is "no relevant evidence . . . regarding the functional and physical requirements" of Plaintiff's job at FCG, other than Patterson's own description and the general description provided by his employer. Id. Based on those descriptions, the Court finds that both travel and standing to give presentations are material duties of Plaintiff's own occupation.

**3.      Patterson's Ability to Perform Material Duties of His Occupation**

Finally, the Court examines whether Aetna's determination as to Plaintiff's ability to perform the material duties of his own occupation was supported by substantial evidence. The Court finds that it was not.

### a. Specific Duties

Aetna failed to address whether Patterson could perform the functional and physical requirements of his job at FCG, relying instead on a generic description of his occupation. Aetna's denial letter explicitly notes that its vocational reviewer looked solely at Patterson's position "in the national economy" and not at "his job as performed for [FCG]." AR at 00283. Its self-acknowledged failure to consider Paterson's actual duties renders its decision arbitrary and capricious. See Witte v. Connecticut Gen. Life Ins. Co., 2007 WL 4300224, at *6 (D.N.J. Dec. 6, 2007) ("To the extent that CIGNA misinterpreted the terms of the Plan and credited irrelevant evidence, while discrediting relevant evidence, the Court finds that CIGNA's denial of benefits to Plaintiff was arbitrary and capricious"); Peck, 495 F. Supp. 2d at 278 ("[B]ecause Aetna has failed to contradict, or even acknowledge, [Plaintiff's] evidence that she could not perform the material duties of her own occupation as an operating room nurse, the court finds that, as a matter of law, [Plaintiff] was totally disabled").

Even if Aetna had considered frequent travel and standing as material duties of Patterson's own occupation, the objective medical evidence in the record supports a finding that Plaintiff could not perform those duties. Both Dr. McPhee's report and Aetna's vocational review listed a variety of accommodations that were necessary to allow Patterson to work in a sedentary job. AR 00666-71, 00872. These accommodations included an ergonomic set-up and a "sit stand" work station. Id. It is unlikely these accommodations would be available to Patterson if he primarily traveled and worked outside of his own office, as Patterson alleges in his appeal letter. Id. at 00849.

Moreover, Dr. Andrews opined Patterson's walking and standing should be limited to forty-five minutes per day. AR 00276. The Court finds no substantial evidence in the record to support a conclusion that Patterson could perform the material duties of his occupation, which included frequent travel and standing, within the limitations identified by Dr. Andrews. Consequently, even viewing the objective medical evidence in the light most favorable to the Defendant, the record demonstrates Patterson's inability to perform the material duties of his own occupation.

### b. Generic Duties

Even utilizing a generic definition of "own occupation," this Court is satisfied that Aetna's decision was nonetheless arbitrary and capricious.

Aetna's own handling of this claim over time raises more question than it answers. After conducting its first and only independent medical examination conducted in April 2009, and undertaking surveillance, Aetna continued to find that plaintiff was disabled. Its own records say so: Patterson "cannot work" and the medical information "continues to support [Patterson's] disability." Id at 00171. Yet the doctor who performed the IME in 2009, like the doctor who undertook the review of medical records in 2014, both found that Patterson was capable of "sedentary work." AR 00180, 00823. So what changed in those five years? In both instances, findings were made after conducting surveillance which demonstrated that Patterson was capable of walking and driving short distances. AR 00469, 480-82. Four years after finding him disabled, Aetna came to a contrary conclusion based on strikingly similar surveillance videos, a review of Facebook posts from Patterson's wife mentioning family vacations, and a medical record review by a nurse. AR at 00055-65, 00868-73, 02195. Why was Patterson "disabled" in 2009 but not disabled in 2014 based on very similar evidence? In reaching its conclusion in 2014, Aetna chose not to credit Patterson's subjective complaints of pain, his narcotic medication intake, or his

consideration of a spinal cord simulator and possible surgery, and did so without conducting an additional independent medical examination. Aetna explains the discrepancy in its findings by arguing that it misapplied the standard for disability for ninety-four months before finally getting it right in 2014. Was Aetna right then, or is it right now? The record suggests that Aetna is looking for any reason to terminate Patterson's benefits.[4] The Court finds that Aetna's decision not to conduct an additional independent medical examination, its inconsistent findings, and its retroactive determination that Patterson was never entitled to LTD benefits are all factors that weigh in favor of finding arbitrariness and capriciousness. Findings based on thin and inconsistent evidence is the hallmark of arbitrariness.

An administrator's decision to forego an independent medical examination can constitute evidence of arbitrariness where, as here, a file review is insufficient. See, e.g., Schwarzwaelder v. Merrill Lynch & Co., 606 F. Supp. 2d 546, 560 (W.D. Pa. 2009) (finding evidence of arbitrariness where a plan administrator relied on a paper-review, discounted subjective complaints, chose not to credit treating physicians, and elected to forego an independent medical examination); see also Haisley v. Sedgwick Claims Mgmt. Servs., Inc., 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011) ("Where the plan at issue specifically provides a plan administrator with the authority to request an independent medical examination, the failure of the plan administrator to procure such an

---

[4]Although not relevant to the purported basis for Aetna's termination of Patterson's benefits here, Aetna's vocational reviews are illustrative of the troubling inconsistencies in the record. The Policy explicitly provides that Patterson is not disabled if he is able to earn 80% of his pre-disability earnings, which amounts to $71.76 per hour. AR 00018, 01152. In 2009, Aetna conducted a labor market study, using $71.76 as the required hourly wage and determined that no employers in Patterson's area met the wage requirement. Id. at 00147-53. On September 9, 2014, after relying on the 80% calculation for five years, Aetna changed its records to indicate that Patterson must be able to perform the material duties of an occupation paying $58.19 per hour, which is only 60% of Patterson's adjusted pre-disability earnings. Id. at 00650-51. Aetna's inexplicable substitution of a lower number after five years of continued certification is particularly concerning given the other inconsistencies in the record.

examination before denying a particular claim may 'raise questions about the thoroughness and accuracy of the benefits determination.'") (quoting <u>Calvert v. Firstar Fin., Inc.</u>, 409 F.3d 286, 295 (6th Cir.2005)).  The lack of an independent medical examination is especially important where the limitations at issue are more adequately addressed through a physical examination than a file review.  <u>See</u> <u>Haisley</u>, 776 F. Supp. 2d at 49 ("Although the ERISA does not require a plan administrator to request that a claimant undergo a medical examination before denying his or her claim, the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review.").

Here, Patterson's claim is largely based on subjective complaints of pain, which are more suited for a physical examination than a file review.  The only physician who examined Patterson in the period leading up to Aetna's termination of his benefits was Dr. Karasek.  Dr. Karasek consistently opined that Patterson was "totally disabled . . . and unable to participate in any meaningful employment."  AR at 00839.  Aetna's decision to forego an independent medical examination is evidence of arbitrariness and capriciousness, especially given Patterson's subjective complaints of pain and his treating physician's opinion.[5]  <u>See</u> <u>Id.</u> at 50 ("Although [plaintiff] suffered from impairments that were not amenable to objective evaluation by means of a file review, she was not asked to undergo a physical or mental examination.  Under these circumstances, [Defendant's] reliance on the opinions of non-examining medical consultants is a factor that weighs in favor of plaintiff.").

---

[5] The Court gives little weight to Dr. Karasek's purported agreement with Nurse McPhee's findings as to Plaintiff's ability to work.  When provided by Aetna with a form asking for whether he agreed with Dr. McPhee's assessment of functionality, Dr. Karasek initially checked on the line indicating disagreement, but then crossed out his mark and checked the line indicating agreement.  AR 00862.  Dr. Karasek later wrote a letter to Aetna unequivocally expressing his disagreement with Nurse McPhee's findings.  <u>Id.</u> at 00839.  If anything, Dr. Karasek's initial response seems to indicate a mistake rather than a clear affirmance of Aetna's decision to terminate Plaintiff's benefits.

The Court is also troubled by Aetna's central argument that Patterson was *never* entitled to LTD benefits but received them based solely on a misapplication of the Policy's definition of disability. See Def's. Reply Mem. at 4 ("Aetna misapplied the definition of disability and mistakenly paid Patterson a large sum of money for 94 months until it applied the correct test of disability."). A retroactive finding that a plaintiff was never entitled to LTD benefits, without new medical information, is itself evidence of arbitrariness and capriciousness. Haisley, 776 F. Supp. 2d at 49 ("Having approved [plaintiff's] application, [defendant] retroactively determined that an award of LTD benefits was not warranted in the first place. Such inconsistent treatment of the same medical information is a factor that weighs in [plaintiff's] favor.") Aetna was not compelled to abide by its previous award of benefits, but its inconsistent treatment of past medical information and failure to conduct an independent examination both weigh in favor of this Court's finding of arbitrariness and capriciousness.

**D.  Remedy**

In determining the appropriate remedy, the Court considers the status quo prior to the unlawful initial denial or termination of benefits. Miller v. Am. Airlines, Inc., 632 F.3d 837, 856 (3d Cir. 2011). When benefits are denied at the outset, the appropriate remedy is to remand to the administrator for full consideration of whether the claimant is disabled. Id. Where, as here, there is a finding that the termination of benefits was unlawful, benefits "should be reinstated to restore the status quo." Id. In this case, Aetna acted arbitrarily and capriciously in terminated Patterson's LTD benefits. Therefore, retroactive reinstatement of the benefits is necessary. Id. Additionally, the Court grants Plaintiff's request for permission to submit an appropriate application for attorney's fees pursuant to ERISA. See 20 U.S.C. 1132(g)(1).

**III.  Conclusion**

The Court **DENIES** Defendant's Motion for Summary Judgment and **GRANTS** Plaintiff's motion for summary judgment. Accordingly, the Court will retroactively reinstate Plaintiff's benefits and grant Plaintiff's request for interest, costs, and fees.

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**United States District Judge**